In re James M. STRICKLAND, Debtor.

Bruce H. Matson, Plaintiff,

v.

Mary K. Strickland and C. Herbert Pund III, Defendants.

Bankruptcy No. 97–31066–S.
Adversary No. 98–3065.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Jan. 26, 1999.

Jeffrey L. Marks, LeClair Ryan, Richmond, VA, for the trustee.

Christopher M. Malone, Thompson & McMullan, Richmond, VA, for the defendant.

### MEMORANDUM OPINION

BLACKWELL N. SHELLEY,
Bankruptcy Judge.

This matter comes before the Court on the complaint brought by Bruce H. Matson, the Chapter 7 Trustee (the "Trustee"), in the above named Adversary Proceeding. In the complaint, the Trustee seeks to recover an alleged preferential transfer made by James M. Strickland, the Chapter 7 debtor (the "Debtor"), to Mary K. Strickland and C. Herbert Pund III (the "Defendants"). Because the alleged preference occurred outside the 90–day period preceding the filing of the Bankruptcy Petition in the above named Bankrupcty Case, the Trustee seeks to establish that the Defendants were "insiders" at the time of the alleged transfer. This is a core proceeding under 28 U.S.C.

§ 157(b)(2)(F); venue is proper under 28 U.S.C. § 1409. Upon consideration of the parties' pleadings, and after a trial held on this matter on November 19, 1998, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

The Debtor filed a Chapter 7 petition with this Court on February 14, 1997, and received a discharge of his debts on June 25, 1998. On June 3, 1998, the Trustee filed a complaint with this Court, asking that the Court: 1) set aside an alleged preferential transfer made by the Debtor to the Defendants pursuant to Bankruptcy Code (the "Code") § 547(b); and 2) allow the Trustee to recover from the Defendants the value of the property allegedly transferred pursuant to Code § 550(a)(1) and/or (a)(2). The Defendants timely answered the complaint on June 22, 1998. A pretrial order governing discovery and other matters was entered by the Court on July 30, 1998 following a pretrial conference on July 29, 1998.

The facts of this matter are essentially not in dispute as the Trustee and the Defendants submitted a Stipulation of Facts (the "Stipulation") to the Court on November 3, 1998. Other facts came out during the testimony of the Defendants during the trial. Mary Strickland ("Strickland"), one of the Defendants, is the Debtor's mother, and began dating Herbert Pund ("Pund"), the other Defendant, in 1991. The two Defendants never became formally engaged prior to their marriage on March 30, 1998; Pund did testify that he gave Strickland a ring just before the wedding.

On or about August 1, 1995, the Debtor approached Pund, who was dating Strickland at the time, and asked for a loan; Pund loaned $11,708.33 to the Debtor (the "Loan"). Pund testified that the Debtor came to him for the Loan because the Debtor knew that Pund had the available funds to make the Loan. The Loan was made pursuant to a check drawn on a Wachovia Bank checking account (account number 4423–100215). The Wachovia checking account was owned and opened by Pund in North Carolina, and Strickland's name was listed on the account as a signatory so that she could sign checks while visiting Pund in North Carolina.[1] Although the Loan originated from this account which listed both Defendants, the testimony was clear and the Court finds that the Loan was from Pund to the Debtor and finds that Pund was the sole lender.

The Loan was not in writing, was not documented in any manner, and was not secured; there was also no stated interest rate on the Loan. Testimony by the Defendants established that the Debtor was graduating from medical school in 1995 and needed the Loan for a down payment on an apartment house. The repayment terms of the Loan were also not in writing. Pund testified that the Debtor was to repay the Loan whenever Pund demanded repayment of the Loan. Pund also testified that at the time of making the Loan, he anticipated that he may need the money back to put towards a down payment on a home in North Carolina as he was shopping around at the time.

In May of 1996, Pund demanded that the Debtor repay the Loan because he had found a home in North Carolina and would need the down payment money. The Debtor obtained the money to repay the Loan through credit card cash advances. A week to ten days after Pund's demand, the Debtor repaid the Loan in the following manner: using Strickland's bank account access card, he deposited $12,000.00 into Strickland's bank account maintained with NationsBank in Richmond, Virginia (account number 0011042235).[2] This manner of repayment was simply out of convenience as the Debtor

---

1. Strickland could write checks and make deposits with the Wachovia account, but testified that she never did either of these activities. Both Defendants testified that Strickland had no ownership interest in the account.

2. The Trustee did not argue that this deposit was a gift from the Debtor to Strickland. Even if this argument had been made, the Court would not

have been able to ascertain the Debtor's intent in making the deposit because the Debtor was not called by the Trustee to testify as a witness. The facts as presented to the Court simply reflect that the Debtor repaid the Loan on demand by depositing the funds into Strickland's account using her bank account access card.

was in Richmond and Pund was in North Carolina at the time.[3] The use of Strickland's account was purely as an accommodation. Testimony established that the $12,000.00 repayment was a figure which the Debtor and Pund agreed on as neither could recall the exact amount of the original Loan, but figured it was close to $12,000.00. The figure was not based on any particular interest rate.

A few months later, on August 16, 1996, Strickland transferred the $12,000.00 from her NationsBank account to a checking account maintained with Centura Bank in North Carolina (account number 053100850).[4] Similar to the Wachovia account referred to above, the Centura account was owned by Pund and Strickland's name was on the account as a signatory (and not as a co-owner) so that she could write checks while in North Carolina. Again, testimony established that Strickland could write checks and make deposits with the Centura account, but she never performed either of these activities; her only involvement with the Centura account was the $12,000.00 transfer. Although the Loan repayment was deposited into Strickland's account and then was transferred to an account which listed both Defendants, testimony was clear and the Court finds that the Loan repayment funds were intended for Pund because he had made the Loan. Thus, the alleged preferential transfer was for Pund's benefit. Pund learned of the transfer after it was made and then proceeded to use the funds for the down payment on the North Carolina home.

As indicated above, the Defendants met in 1991, were never formally engaged, never formally lived together, and married on March 30, 1998. As of the date of the trial, the Defendants were still married, thus making Pund the Debtor's stepfather. At the time the Loan was made and repaid and throughout all of the above transactions, the Defendants were neither married nor engaged.

At the conclusion of the trial, the Court took the matter under advisement.

## CONCLUSIONS OF LAW

### I. Elements of a Preference and the Trustee's Burden

■ Section 547(b) of the Code sets out the elements of a preferential transfer:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The purpose of the Code's preference avoidance provision is two-fold: 1) to accomplish the proportionate distribution of the debtor's assets among its creditors, and 2) to prevent the transfer to one creditor which would diminish the estate of the debtor which would otherwise be available for distribution to all creditors. *See In re Futoran,* 76 F.3d 265, 267 (9th Cir.1996); *see also In re Perma*

---

**3.** Pund testified that he found out about this method of repayment after the fact and did not dictate that the Loan be repaid in this way.

**4.** Pund testified that the money remained in Strickland's NationsBank account for a few months before the transfer because at the time the Debtor made the deposit into the NationsBank account, Pund did not need the money for the down payment. At the time of the demand for the repayment, May of 1996, Pund had found a home in North Carolina but did not need the down payment money until August.

*Pacific Properties,* 983 F.2d 964, 968 (10th Cir.1992).

■ All elements of the above Code section must be proven before a transfer will be avoided; the absence of any of the elements constituting a voidable preference negates the Trustee's claim. *See In re Mama D'Angelo, Inc.,* 55 F.3d 552, 554 (10th Cir.1995). Thus, in order to prevail in the case at bar, the Trustee must prove all of the above five elements, and the burden of proof is by a preponderance of the evidence. *See In re Professional Coatings (N.A.), Inc.,* 210 B.R. 66, 73 (Bankr.E.D.Va.1997); *see also In re Ralar Distribs., Inc.,* 4 F.3d 62, 67 (1st Cir. 1993).

## II. Elements Not in Dispute

Several of the elements of a preference are not in dispute here. The Debtor's repayment of the Loan was certainly a transfer of an interest of the Debtor in property; the Defendants conceded this element in their Answer filed with the Court. The repayment of the Loan was for the benefit of Pund, who was a creditor of the Debtor at the time when the Loan was repaid.[5] The repayment or transfer was made on account of an antecedent debt owed by the Debtor before the transfer was made; the transfer was made in May of 1996 while the debt became "owed" in August of 1995 when the Debtor received the Loan.[6] The time period is also not in dispute: the transfer was made by the Debtor to Pund in May of 1996 and the Debtor filed his petition in February of 1997.[7] Because the transfer did not occur within the 90-day period preceding the filing of the petition, the presumption of insolvency in Code § 547(f) is not applicable, and the Trustee has the burden of demonstrating the Debtor's insolvency at the time of the alleged preference. In addition, the Trustee must prove that Pund was an "insider" at the time of the transfer.

Finally, subsection (5) of Code § 547(b) is not in dispute. The Debtor's bankruptcy case was a no asset Chapter 7 case, and as an unsecured creditor, Pund would have received little or nothing if he were still a creditor at the time of the petition. Pund's receipt of the full amount of the Loan enabled him to receive more than he would have received if he was a creditor participating in the Debtor's Chapter 7 bankruptcy proceeding because the Debtor's liabilities far exceeded his assets at the date of filing;[8] however, the fact that the Debtor's liabilities exceeded his assets on the petition date does not necessarily translate into a finding that this was the case at the time of the alleged preference. *See* discussion *infra* Parts III.B, III.C (judicial notice of the Debtor's schedules to prove insolvency).

Thus, only two elements of the preference section remain to be addressed: whether the Debtor was insolvent at the time when the transfer was made, and whether Pund was an "insider" at the time when the transfer

---

5. The relevant definition of "creditor" for purposes of this matter appears in Code § 101(10)(A): "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor...." The claim of Pund arose before the order for relief as the Loan was made on or about August 1, 1995, and the Debtor filed his Chapter 7 petition on February 14, 1997. The Defendants admit in their Answer that Pund was a creditor of the Debtor and that the repayment was for his benefit.

6. The Defendants admit this element in their Answer but only as to Pund.

7. The Defendants admit this element in their Answer but only as to Pund.

8. This Court, in *In re Kel–Wood Timber Products Co.,* 122 B.R. 498 (Bankr.E.D.Va.1990), held that the debtor's payment of $35,000.00 to pay down a $48,000.00 loan owed to an unsecured creditor enabled that creditor to receive more than he would have received in liquidation if the transfer had not been made. The evidence in *Kel–Wood* indicated that the debtor's liabilities exceeded its assets on the date of filing the petition, and insolvency on the petition date indicated that the unsecured creditor received more than it would have in a Chapter 7 case. In the case at bar, the fact that the Debtor was insolvent on the petition date and the fact that Pund was an unsecured creditor of the Debtor indicate that Pund's receipt of the $12,000.00 Loan repayment enabled him to receive more than in a Chapter 7 case. Even more persuasive is the fact that in *Kel–Wood,* only approximately 73% of the Loan was repaid while in the case at bar, 100% of the Loan was repaid.

was made. A discussion of these two remaining elements follows.

## III. The Debtor's Insolvency at the Time of the Transfer

### A. Definition of Insolvency and Proof

As provided above, one of the elements of a preference which the Trustee must prove is that the Debtor was insolvent when the Loan repayment, or transfer, was made. Code § 101(32) provides the Court with the definition of insolvency:

"insolvent" means—

> (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair evaluation, exclusive of—
>
> > (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> >
> > (ii) property that may be exempted from property of the estate under section 522 of this title;

The balance sheet test for insolvency determines whether the debtor was insolvent when the transfer was made; this test involves the comparing of the fair value of the debtor's assets at the time of the transaction with the debtor's liabilities on the same date. *See In re Miller & Rhoads, Inc.*, 146 B.R. 950, 955 (Bankr.E.D.Va.1992); *see also In re Food & Fibre Protection, Ltd.*, 168 B.R. 408, 417 (Bankr.D.Ariz.1994), *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166 (7th Cir. 1990). As provided above, because the transfer here occurred outside the 90–day period preceding the Debtor's bankruptcy filing, the presumption of insolvency in Code § 547(f) is not applicable; thus, the Trustee has the burden of satisfying the balance sheet test and proving the Debtor's insolvency on the actual date of the Loan repayment by a preponderance of the evidence. *See In re Artha Management, Inc.*, 174 B.R. 671, 678 (Bankr.S.D.N.Y.1994); *see also In re Parker Steel Co.*, 149 B.R. 834, 844 (Bankr.N.D.Ohio 1992), *In re David Jones Builder, Inc.*, 129 B.R. 682, 689 (Bankr.S.D.Fla.1991).

In terms of proof, the Trustee can use any appropriate means to prove insolvency on the date of the alleged preferential transfer. *See Porter v. Yukon National Bank*, 866 F.2d 355, 356 (10th Cir.1989). In addition, the Court has broad discretion when considering evidence to support a finding of insolvency. *See In re Roblin Industries, Inc.*, 78 F.3d 30, 35 (2nd Cir.1996). The Court in *Roblin* noted that whenever it is possible, a determination of insolvency should be based on seasonable appraisals or expert testimony. *Id.* at 38. In the case at bar, the Trustee offered no proof of the Debtor's insolvency; instead, following the trial, the Trustee asked the Court to take judicial notice of the Debtor's schedules in order to make a finding of insolvency.

### B. Judicial Notice of the Debtor's Schedules to Prove Insolvency

After the submission of all evidence, the Trustee asked the Court, in his rebuttal closing argument, to take judicial notice of the Debtor's schedules only after Defendants' counsel, in his closing argument, challenged the insolvency issue on the basis that no evidence had been offered on that issue. The insolvency issue had not been raised by either party during the evidentiary hearing. The Court notes that the Trustee did not specify what the Court was to look for or focus upon in taking judicial notice of the schedules. Judicial notice is covered by the Federal Rules of Evidence in Rule 201:

> (c) **When discretionary.** A court may take judicial notice, whether requested or not.
>
> (d) **When mandatory.** A court shall take judicial notice if requested by a party and supplied with the necessary information.
>
> (f) **Time of taking notice.** Judicial notice may be taken at any stage of the proceeding.

It is well established that the Court is duty bound to take judicial notice of its own records. *See In re Ponn Realty Trust*, 4 B.R. 226, 228 (Bankr.D.Mass.1980). It is also established in the Eastern District of Virginia that the Court may exercise its discretion to take judicial notice of the bankrupt's schedules in an adversary proceeding arising from

the same bankruptcy case. *See In re Washington*, 41 B.R. 211, 216 (Bankr.E.D.Va. 1984). However, if the Court decides to take judicial notice of the schedules, the Bankruptcy Courts are split as to whether the Court can use these schedules in order to determine the insolvency issue.

Several opinions hold that in reviewing the debtor's financial condition, a Court can take judicial notice of the debtor's schedules in order to determine if the debtor was insolvent on the date of the preferential transfer. *See In re Trans Air, Inc.*, 103 B.R. 322, 325 (Bankr.S.D.Fla.1988); *see also Matter of Claxton, III*, 32 B.R. 219, 222 (Bankr.E.D.Va. 1983), *In re Blue Point Carpet, Inc.*, 102 B.R. 311, 320 (Bankr.E.D.N.Y.1989). On the other hand, several opinions hold that while normally the Court may take judicial notice of the facts disclosed in papers on file in the bankruptcy proceeding, even when they are not offered in evidence, the Court may not use them in determining insolvency. *See In re Phippens*, 4 B.R. 155, 160 (Bankr. M.D.Tenn.1980); *see also In re Lease-A-Fleet, Inc.*, 141 B.R. 853, 860 (Bankr.E.D.Pa. 1992), The Honorable Barry Russell, *Bankruptcy Evidence Manual* § 201.8, at 281 (1999).

Assuming, without deciding, that the Court can take judicial notice of the Debtor's bankruptcy schedules to determine the insolvency issue, the Court, as requested by the Trustee, will take such judicial notice in the case at bar. This is the only evidence on this issue which will be considered because the Trustee offered no other proof.[9]

## C. Debtor's Schedules Do Not Prove Insolvency

■ One of the pieces of information relevant to insolvency contained in the Debtor's underlying bankruptcy schedules, which were filed with the Debtor's bankruptcy petition on February 14, 1997, is the page entitled "Summary of Schedules." This summary indicates that there are 19 sheets in the schedules, and that at the time of filing the peti-

tion, the Debtor had 21 creditors, $232,627.36 in total liabilities, and $131,150.00 in total assets. Thus, on the date of filing the petition, the Debtor appeared to be insolvent because his liabilities exceeded his assets, satisfying the required balance sheet test. Insolvency on the petition date, however, does not mean that the Debtor was insolvent at the time when the Loan was repaid, and because the schedules are the only evidence which the Court has to consider, the Court finds that the Trustee has not carried his burden on this issue. The Trustee made no showing nor offered any proof as to whether the Debtor's liabilities exceeded his assets when the alleged preference was made.

■ Evidence of insolvency on the date of the alleged preference is the critical issue and proof of insolvency on any other date is insufficient. *See In re Davis*, 120 B.R. 823, 825 (Bankr.W.D.Pa.1990). Thus, proof by the Trustee that the Debtor was insolvent on the petition date does not translate into a finding of insolvency nine months earlier; the determination is to be made at the time of the alleged preference, not at the time of the petition. *Id.* The fact that the Debtor was insolvent nine months after the alleged transfer is immaterial because evidence of insolvency on a date significantly distant in time from the date of the alleged transfer, without more, is "insufficient to support finding of insolvency on date of transfer for preference ... purposes." *In re Washington Bancorporation*, 180 B.R. 330, 333 (Bankr.D.D.C.1995) (Court held that proof of insolvency in August of 1990 was not sufficient to demonstrate insolvency on the date of the alleged preference in February of 1990).

■ In addition, the Debtor's schedules are not persuasive, dispositive, or controlling on the question of the Debtor's insolvency at the time of the alleged preference; proper analysis should focus on more accurate evidence, including current appraisals, opinion

---

9. The Trustee did elicit testimony during the trial which established that the Debtor obtained the money to repay the Loan through credit card cash advances. In closing argument, the Trustee argued that this form of obtaining money is in-

dicative of insolvency. The Court disagrees with this argument. Additionally, there was no showing by the Trustee that the Debtor's liabilities exceeded his assets when the advances were obtained.

valuation, actual sales of the assets, and tax returns. *See In re Schwinn Bicycle Co.*, 192 B.R. 477, 487 (Bankr.N.D.Ill.1996). The only evidence of insolvency which the Court has before it is the Debtor's schedules. Several Courts have applied the "retrojection" rule, which provides as follows: if a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates the absence of any substantial or radical changes in the assets or liabilities of the debtor between the two retrojection dates, then the debtor is deemed to be insolvent at all intermediate times. *See In re Terrific Seafoods, Inc.*, 197 B.R. 724, 731 (Bankr.D.Mass.1996); *see also In re Thomas*, 7 B.R. 389, 393 (Bankr.W.D.Va. 1980). By use of the schedules, the Trustee may have proven insolvency on the last relevant date, but not on a first known date, thus rendering this retrojection test irrelevant here.

In *In re Perry*, 158 B.R. 694 (Bankr. N.D.Ohio 1993), the Court took an approach similar to the retrojection test. The Court there found that the debtor was insolvent on the petition date by examining the debtor's schedules and finding that liabilities exceeded assets. The Court then looked to the time when the debtor's debts were incurred, and found that the majority of the debts were incurred prior to the date of the alleged preferential transfer. Based on this finding, the Court concluded that it was clear that the debtor was insolvent at the time of the transfer. *Id.* at 697–698. Applying this analysis here does not prove that the Debtor was insolvent during the month of May of 1996, the date of the Loan repayment and alleged preference.

Assuming that the debts listed in the schedules are correct as to time and amount, an analysis of the Debtor's schedules reveals the following: the total amount of debt incurred on or before May 31, 1996 is $121,-955.77, while the total amount of debt incurred after May 31, 1996 is $110,671.59 (these two figures add up to $232,627.36, the total amount of debt on the petition date). Thus, on May 31, 1996, the Debtor's assets

actually exceeded his liabilities as his assets on this date totaled approximately $131,-000.00 while his liabilities totaled $121,-955.77.[10] The Debtor's schedules seem to show that the Debtor was insolvent on the petition date, but also seem to indicate that the Debtor was solvent at the time of the alleged preference, the only important time in issue here. Assuming that the Court can take judicial notice of the schedules where no reference is made to any particular item in those schedules, it is not the belief of this Court that Federal Rule of Evidence 201 requires the Court to engage in the analysis as done here to comport with the Rule.

### D. Conclusion on the Insolvency Issue

In conclusion, the Court finds that the Trustee has not carried his burden here and has not proven by a preponderance of the evidence that the Debtor was insolvent at the time of the alleged preference, an element required by Code § 547(b)(3). Taking judicial notice of the Debtor's schedules, the Court finds that while the Debtor may have been insolvent in February of 1997 when the bankruptcy petition was filed, the Trustee has not proven that the Debtor was insolvent in May of 1996, the time of the alleged preferential transfer. The Trustee's preference claim, therefore, must fail. Even if the Court were to find that the Debtor was insolvent at the time of the transfer, the Trustee's preference claim would still fail because, as discussed below, the Court finds that Pund was not an "insider" at the time of the alleged preference.

### IV. Insider Analysis

#### A. Definitions

■ Because the alleged preferential transfer occurred outside the 90–day period preceding the Debtor's Chapter 7 petition, the Plaintiff must show that Pund was an insider at the time when the transfer was made. As provided in the Findings of Fact, the Loan was made from Pund to the Debtor, and the repayment of the Loan was made from the Debtor to Pund. Although

10. The Debtor's schedules reveal that the Debtor's primary asset, a parcel of real property, was

purchased in August of 1995 and that the value of this property was approximately $131,000.00.

Strickland's name appeared on the accounts involved in the Loan transaction and repayment, her role was merely as an accommodation.

■■■■ The Code, in § 101(31), defines insider as follows:

"insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control;

The Code, in § 101(45), defines relative as follows:

"relative" means individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree;

Clearly, Pund does not fall within the Code definition of insider or relative because he was not related to the Debtor at the time when the Loan was repaid. Currently, Pund is the Debtor's stepfather, but at the time of the transfer, Pund and Strickland were not married and thus Pund was not related to the Debtor. The list of insider qualifiers in Code § 101(31), however, is not an exhaustive list; the use of the word "including" in the definition indicates that the list is intended to be illustrative and not exclusive. *See Matter of Krehl*, 86 F.3d 737, 741 (7th Cir. 1996); *see also Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir.1996). Thus, Pund could still qualify for insider status even though he does not fall within one of the categories in the definition.

■■■■ The legislative history of the insider definition states that an insider is "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S.REP. NO. 95–989, at 25 (1978). The Eastern District of Virginia, in *In re Practical Inv. Corp.*, 95 B.R. 935 (Bankr.E.D.Va.1989), adopted this definition and stated that to qualify as an insider, the party must have considerable control or a high likelihood of control over a debtor. Mere financial power over the debtor, however, does not necessarily impute insider status. *Id.* at 941. The case law is clear that the insider analysis is a fact intensive one and must be decided on a case by case basis. *See In re Three Flint Hill Ltd. Partnership*, 213 B.R. 292, 298 (D.Md.1997). Cases which have considered this issue have focused on two factors in making a determination: 1) the closeness of the relationship between the transferee and the debtor, and 2) whether the transactions between the transferee and the debtor were conducted at arm's length. *See In re Holloway*, 955 F.2d 1008, 1011 (5th Cir.1992).

**B. Cases Cited by the Trustee**

The Trustee cited several cases during argument at the trial which he contends support the finding of Pund to be an insider. The cases cited are the following, along with a description of the relationship between the debtor and a party who was found to be an insider:

*In re Tanner*, 145 B.R. 672 (Bankr. W.D.Wash.1992) (debtor and insider lived together in an intimate homosexual relationship which was marked by a ceremony); *In re Kucharek*, 79 B.R. 393 (Bankr.E.D.Wis. 1987) (debtor and insider were close and intimate friends for many years and there were many loans made between the two without any signed promissory notes or payments); *In re O'Connell*, 119 B.R. 311 (Bankr.M.D.Fla.1990) (debtor and insiders were personal friends and over $400,000 of loans were exchanged between the parties over a four year period on an informal basis with no documentation); *In re Montanino*, 15 B.R. 307 (Bankr.D.N.J.1981) (debtor lived with the insiders' daughter and held out the insiders to be his relatives in a deed conveying real property to them); *In re Three Flint Hill Ltd. Partnership*, 213 B.R. 292 (D.Md. 1997) (insider entered into an agreement with the debtor for the primary purpose of facilitating the debtor's efforts to confirm its own plan); *In re McIver*, 177 B.R. 366 (Bankr.N.D.Fla.1995) (debtor and insider had a personal and financial relationship and lived together for over two years; insider

financed the debtor's investments, debtor appointed insider to be a director of his corporation, insider allowed debtor to use her credit cards, and debtor executed holographic will to insure that the insider would be repaid); *In re Holloway*, 955 F.2d 1008 (5th Cir.1992) (debtor and insider were married to each other for twenty years, had three children in common, and maintained frequent contacts with one another after their divorce).

■ It is the Court's opinion that these cited cases set a very high standard for insider status, and the Trustee has failed to convince the Court that Pund meets this standard. It is undisputed that the Loan was not in writing, was not documented in any manner, was not secured, and had no stated interest rate. In addition, the Loan was repaid within a week to ten days after Pund's demand for the money, a fact which the Trustee argues is indicative of Pund's control over the Debtor. These facts by themselves, however, do not elevate Pund to insider status. There was no evidence of a particularly close relationship between the Debtor and Pund, and it appears that this was the only type of loan which has been made between the two. The cases where insider status was found based on the informality of the financial transactions between the parties, *Kucharek* and *O'Connell*, involved numerous loans between the parties, not just one. The Debtor and Pund did not live together, the Debtor did not include Pund in a holographic will, the Debtor did not appoint Pund to be a director of a corporation, Pund did not allow the Debtor to use his credit cards (Strickland allowed the Debtor to use her ATM card), the Debtor did not hold out Pund to be his relative, and the Debtor did not deed any property to Pund. The fact that Pund was dating the Debtor's mother at the time when the Loan was repaid also is not enough to qualify Pund as an insider.

## C. Other Reported Decisions

Other cases not cited by the Trustee lend support to the Court's conclusion. In *In re Kong*, 196 B.R. 167 (N.D.Cal.1996), the Court held that the relationship between the debtor and the alleged insider must be more than the debtor-creditor relationship, and found that a bank's daily pressure on a debtor to cover an overdraft is not enough. Translated to the case at bar, Pund's ability to demand repayment of the Loan is similar to a bank's pressure and is not enough to elevate the relationship here above the debtor-creditor status. In *In re Reinbold*, 182 B.R. 244 (D.S.D.1995), the Court held that friendship alone is insufficient to confer insider status, and stated that the creditor needs to dominate the debtor in order to rise to the insider level. Thus, the fact that Pund and the Debtor were friends because Pund was dating the Debtor's mother is insufficient, and the Trustee presented no evidence of Pund's dominance over the Debtor. As stated above, Pund could demand repayment of the Loan at any time, but this ability certainly does not rise to the level of dominance.

■ Finally, as provided above, the Eastern District of Virginia, in *Practical Inv. Corp.*, held that an insider must have considerable control or a high likelihood of control over a debtor, and held that mere financial power over the debtor does not necessarily impute insider status. 95 B.R. at 941; *see also In re Vinard*, 133 B.R. 217 (Bankr. S.D.Ind.1991) (Court held that floor plan financier's financial power over debtors did not, standing alone, make it an insider). Pund did not have considerable control or a high likelihood of control over the Debtor to make the transaction not at arm's length. Once the Debtor received the Loan, he could do whatever he liked with it without Pund's approval; there were no strings attached as to how the Debtor was to use the Loan, a fact indicative of Pund's lack of control over the Debtor. The Defendants testified that the Debtor needed the Loan to make a down payment on an apartment house, but there was no evidence that the Debtor had to use the money in this fashion. The only way in which Pund controlled the Debtor was Pund's ability to demand repayment. The Court finds that this ability only qualifies as mere financial power over the Debtor, which, as stated above, does not necessarily impute insider status.

## D. Conclusion on Insider Issue

According to the Code definitions of insider and relative, Pund was neither at the time of the alleged preference because he was not married to Strickland at that time and thus was not the Debtor's stepfather. The insider definition, however, is not exhaustive and the Court must look to the facts to determine if Pund and the Debtor had a close enough of a relationship to make the transaction not at arm's length. Pund was one party removed from the mother-son relationship between the Debtor and Strickland and did not have a sufficiently close relationship to qualify as an insider. In addition, Pund did not exercise considerable control over the Debtor to make the transaction not at arm's length as his ability to demand repayment can only constitute mere financial power, which is insufficient to support an insider finding. Because the transfer occurred outside of the 90 days preceding the Debtor's bankruptcy filing, Pund must be an insider for the Trustee's § 547(b) preference claim to prevail. The Court finds that Pund was not an insider at the time when the Loan was repaid, and thus the Trustee's claim must fail.

### CONCLUSION

In order to prevail on a Code § 547(b) preference claim, the Trustee must prove all of the elements of a preference by a preponderance of the evidence. The two elements in dispute here are whether the Debtor was insolvent when the alleged preference was made and whether Pund was an insider at the time of the alleged preference. The only evidence of insolvency offered by the Trustee was his oblique reference to the Court's taking judicial notice of the Debtor's schedules during his rebuttal argument after the Defendants' counsel raised the issue of the lack of proof of insolvency in his argument. The Court finds that the information contained in the Debtor's underlying bankruptcy schedules is insufficient to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the alleged preference. Even if the Court were to find that the Debtor was insolvent, the Trustee's claim would still fail because the Court finds that the relationship between Pund and the Debt-

or was not close enough to elevate Pund to insider status.

The Trustee has failed to carry his burden here because all of the elements of Code § 547(b) have not been proven by a preponderance of the evidence. The Trustee's claim, therefore, must fail. An appropriate Order will be entered simultaneously herewith in conformity with this Memorandum Opinion.