**In re Alan D. EMERSON and Brenda E. Emerson, Debtors.**

**Jeffrey A. Schreiber, Chapter 7 Trustee, Plaintiff,**

**v.**

**William H. Stephenson and John W. Stephenson, Defendants.**

**Bankruptcy No. 97–10318–JMD. Adversary Nos. 99–1006–JMD, 97–1095–JMD.**

United States Bankruptcy Court, D. New Hampshire.

April 19, 1999.

---

Jeffrey A. Schreiber, Randall L. Pratt, Schreiber & Associates, P.C., Danvers, MA, for Jeffrey A. Schreiber, Chapter 7 Trustee.

John A. Rogers, Meredith, NH, William H. Stephenson and John W. Stephenson.

### MEMORANDUM OPINION AND ORDER

J. MICHAEL DEASY, Bankruptcy Judge.

## I. INTRODUCTION

Alan Emerson and his wife Brenda Emerson (collectively the "Debtors") filed Chapter 7 bankruptcy on January 31, 1997. Jeffrey Schreiber, the Chapter 7 Trustee (the "Trustee"), brought suit against the Debtors seeking to deny the Debtors their discharge under 11 U.S.C. § 727 (Adv. No. 97–1095–JMD). The Trustee also brought suit against John Stephenson and his son William Stephenson (collectively the "Stephensons") seeking (1) to recover a 1978 Piper Seneca aircraft (the "Seneca") transferred by Robert Swain to William Stephenson on or about August 6, 1996; (2) to recover a Piper Warrior aircraft (the "Warrior") transferred by Alan Emerson to John Stephenson on or about October 21, 1996; (3) to avoid a security interest in Alan Emerson's inventory, equipment, accounts, and general intangibles granted to John Stephenson in September 1996; and (4) to avoid an identical security interest granted to William Stephenson in September 1996 (Adv. No. 99–1006) (the "Stephenson Complaint"). The two adversary proceedings have been consolidated for trial.

In Count I of the Stephenson Complaint, the Trustee seeks to avoid all four transfers pursuant to 11 U.S.C. § 547, the Bankruptcy Code's preferential transfer provision. In Count II, the Trustee seeks to avoid all four transfers pursuant to 11

U.S.C. § 548, one of the Bankruptcy Code's fraudulent transfer statutes. In Count III, the Trustee seeks to avoid all four transfers pursuant to 11 U.S.C. § 544 and New Hampshire RSA 545–A:4 and 5, the state fraudulent transfer provisions.

The Stephensons have filed a motion for summary judgment. In it they argue that they are entitled to summary judgment against the Trustee on his claims under 11 U.S.C. § 547 in Count I and under 11 U.S.C. § 544 and RSA 545–A:5(II) in Count III because the Stephensons are not insiders within the meaning of 11 U.S.C. § 101(31) or RSA 545–A:1(VII) and therefore the transfers are not preferential or fraudulent under 11 U.S.C. § 547 or RSA 545–A:5(II). They also argue that they are entitled to summary judgment on the Trustee's claim under 11 U.S.C. § 544 and RSA 545–A:5(I) in Count III because (1) the Trustee has failed to offer evidence establishing a transfer by the Debtors with regard to the Seneca; (2) the Trustee has failed to offer evidence establishing the lack of a security interest in the Warrior or of John Stephenson's efforts to foreclose that interest; and (3) the Trustee has failed to offer evidence establishing the lack of "reasonably equivalent value" with regard to the UCC–1 liens. The Stephensons further argue that they are entitled to summary judgment on the claims under 11 U.S.C. § 548 in Count II and under 11 U.S.C. § 544 and RSA 545–A:4 in Count III because (1) the Trustee cannot establish that the Debtors had an "interest" or "rights" in the Seneca; (2) the Trustee cannot establish that the Debtors had an "interest" or "rights" in the Warrior for which the Debtors received "less than a reasonably equivalent value" upon transfer of the airplane; and (3) the Trustee cannot prove that the Debtors had an "interest" or "rights" in the UCC–1 collateral for which the Debtors received "less than a reasonably equivalent value" when they granted security interests to the Stephensons.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id.* at 322–23, 106 S.Ct. 2548; *see Ralar Distribs., Inc. v. Rubbermaid, Inc. (In re Ralar Distribs., Inc.)*, 4 F.3d 62 (1st Cir. 1993) ("As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trial worthy issue warrants

summary judgment for the moving party."). The burden on the moving party may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

### A. Insider Status

■ A transfer of an interest of the debtor in property can be avoided as a preference under 11 U.S.C. § 547(b) if the transfer was made:

1. to or for the benefit of a creditor;

2. for or on account of an antecedent debt owed by the debtor before the transfer was made;

3. while the debtor was insolvent;

4. within ninety days before bankruptcy or between ninety days and one year before bankruptcy, if the transferee was an insider at the time of the transfer; and

5. the transfer enables the creditor to receive more than it would receive if the case were a case under Chapter 7 of the Code, the transfer had not been made, and the creditor received payment of its debt to the extent provided by the Code.

*See* 11 U.S.C. § 547(b); *Collier on Bankruptcy* ¶ 547.01 (15th rev. ed.1996). Since the transfers which the trustee alleges are preferential occurred more than 90 days before the bankruptcy, the Trustee cannot prevail on his claim under § 547 of the Bankruptcy Code unless he can show that the Stephensons are insiders.

Similarly, RSA 545–A:5(II) provides:

A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an *insider* for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

[Emphasis added.] Thus, under both the federal and state statutes, the Trustee must prove that the Stephensons were insiders.

■ The determination of whether a person is an insider is a question of fact, and it is one on which the Trustee bears the burden of proof at trial. *Browning Interests v. Allison (In re Holloway),* 955 F.2d 1008, 1014 (5th Cir.1992); *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman),* 126 B.R. 63, 70 (BAP 9th Cir. 1991); *Damir v. Trans–Pacific Nat'l Bank (In re Kong),* 196 B.R. 167, 171 (N.D.Ca. 1996); *Lingley v. Stuart Shaines, Inc. (In re Acme–Dunham Incorporated),* 50 B.R. 734, 739 (D.Me.1985); *see* 11 U.S.C. § 547(g). Once the underlying facts are resolved, however, insider status ultimately is a question of law. *Holloway,* 955 F.2d at 1014. In appropriate cases, therefore, insider status can be resolved at the summary judgment stage. *Miller v. Schuman (In re Schuman),* 81 B.R. 583, 586 n. 1 (BAP 9th Cir. 1987); *Kong,* 196 B.R. at 171.

■ An "insider" of an individual debtor includes:

1. A relative of the debtor;

2. A partnership in which the debtor is a general partner;

3. A general partner of the debtor; or

4. A corporation of which the debtor is a director, officer, or person in control.

11 U.S.C. § 101(31); RSA 545–A:1(VII). The use of the word "includes" in the Bankruptcy Code definition of an insider is not a limiting term. *Loftis v. Minar (In re Montanino),* 15 B.R. 307, 310 (Bankr. D.N.J.1981). Courts have widely agreed that Congress did not intend to limit the classification of insiders to the statutory definition. *See, e.g., Schuman,* 81 B.R. at 586. The term insider is open-ended and not susceptible of precise specification. *Acme–Dunham Incorporated,* 50 B.R. at 739 (citing S.Rep. No. 95–989, 95th Cong.2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 5787, 5810).

The legislative history of 11 U.S.C. § 101(31) states that "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made

subject to closer scrutiny than those dealing at arms length with the debtor." S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978); H. Rep. No. 595, 95th Cong., 1st Sess. 312 (1977). Cases that have considered this issue generally have focused on two factors in making the determination of whether a transferee is an insider: (1) the closeness of the relationship between the transferee and the debtor, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. *Holloway*, 955 F.2d at 1011; *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 285 (Bankr.E.D.Va.1999). The factual elements that courts have used in applying these factors to the determination of whether a transferee is an insider include:

1. Whether the loan made to the debtor was documented (e.g., promissory note, mortgage, and specified repayment terms), *Montanino*, 15 B.R. at 310; *Koch v. Rogers (In re Broumas)*, 203 B.R. 385, 391 (D.Md.1996), *aff'd in part and rev'd in part* 135 F.3d 769 (4th Cir.1998);

2. Whether the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans, *Holloway*, 955 F.2d at 1012; *Rush v. Riddle (In re Standard Stores, Inc.)*, 124 B.R. 318, 325 (Bankr.C.D.Cal.1991);

3. Whether the transferee knew that the debtor was insolvent at the time the debtor made the loans or recorded the security agreements, *Holloway*, 955 F.2d at 1012;

4. Whether there were numerous loans between the parties, *Strickland*, 230 B.R. at 286;

5. Whether there were any strings attached as to how the debtor could use loan proceeds, *id.;*

6. Whether the loans were commercially motivated, *Holloway*, 955 F.2d at 1012;

7. Whether the transferee had an ability to control or influence the debtor, *Kong*, 196 B.R. at 171; *Freund v. Heath (In re McIver)*, 177 B.R. 366, 370 (Bankr.N.D.Fla.1995); *Sticka v. Anderson (In re Anderson)*, 165 B.R. 482, 487 (Bankr.D.Or.1994); *Torcise v. Cunigan (In re Torcise)*, 146 B.R. 303, 305–06 (Bankr.S.D.Fla.1992);

8. Whether there was a personal, business, or professional relationship between the transferee and the debtor allowing the transferee to gain an advantage such as that attributable simply to affinity, *McIver*, 177 B.R. at 370; *Friedman*, 126 B.R. at 70;

9. Whether the transferee had authority to make business decisions for the debtor, *Kong*, 196 B.R. at 172;

10. Whether there is evidence of a desire to treat the transferee differently from all other general unsecured creditors, *Montanino*, 15 B.R. at 310;

11. Whether there was an agreement among the parties to share profits and losses from business transactions, *Friedman*, 126 B.R. at 70.

The summary judgment record in this case, when viewed in the light most flattering to the Trustee, contains evidence which could support a finding that John Stephenson was an insider of the Debtors at the time of the relevant transfers. For example, the first loan from John Stephenson to Alan Emerson in December 1978 was an unsecured loan. Exhibit 2 to John Stephenson Deposition. The February 25, 1983 loan agreement for Hangar 35 contained no specific loan amount, rate, or amortization period.

In addition, the parties maintained a close relationship. In her deposition, Brenda Emerson described John Stephenson as a "good friend." Brenda Emerson Deposition at 15. John Stephenson stated at his deposition that he got together with Alan Emerson and Emerson's attorney to discuss what to do about the non-payment issue. John Stephenson Deposition at 34. John Stephenson also talked to the Emersons' lawyer in connection with litigation against Alan Emerson by the Federal

Aviation Administration (the "FAA") to provide technical assistance with the Emersons' case. *Id.* at 42. Alan Emerson testified that he and John Stephenson became "friends." Alan Emerson Deposition at 8. Alan Emerson also testified that he and John Stephenson had discussions regarding Alan's problems: "At one time it was suggested that we ought to file bankruptcy and Jack—I didn't want to and Jack didn't want to." *Id.* at 21 and 24.

The Trustee has also pointed to evidence that suggests that the Debtors and the Stephensons may have been involved in some kind of joint venture or agreement to share profits. At his deposition, John Stephenson stated there was "always something better coming up. *We were going to make more money when we had the second hangar* and was going to be able to pay this all off." John Stephenson Deposition at 44 [emphasis added]. John Stephenson also testified that he did not exercise his right to foreclose upon the Debtors' default because of his interest in obtaining more units in the hangar that he and Alan Emerson were going to build. *Id.* at 45. Alan Emerson also testified at his deposition that he and John were "working ... [toward] a common objective." Alan Emerson Deposition at 55. Brenda Emerson testified that John Stephenson "wanted Alan to remain in business. At that time there was nobody on the field that was doing general aviation." Brenda Emerson Deposition at 16. The parties even went so far as to state in the February 25, 1983 loan agreement that their "objective [was] to insure the success of Emerson's business while providing cost effective protection for Stephenson's aircraft, continuing in the common sense, gentlemanly way we have."

There is other evidence in the record to suggest that the parties' dealings were not at arm's length. John Stephenson testified at his deposition that the issue of crediting the Debtors with regard to the transfer of the Seneca was "one of those loose things," when they figured out a value, they were going to credit the Debtors with respect to their mechanics' lien. John Stephenson Deposition at 47. He acknowledged that "[w]e hadn't formalized it." *Id.* at 56. Alan Emerson testified that he did not know what he owed the Stephensons at any given time. Alan Emerson Deposition at 58. Brenda Emerson testified regarding the Debtors' receipt of credit for maintenance work performed on the Seneca after it was transferred: "I'm sure Jack would have taken it off what we owed him" however "[n]othing formal was stated about it." Brenda Emerson Deposition at 49–50.

In addition, John Stephenson testified that he last received payment on his outstanding loans in April 1995. John Stephenson Deposition at 23 and 49. William Stephenson never received any payments on his loans. *Id.* Despite the Debtors' history of non-payment, the Stephensons purchased the first mortgage position held by Laconia Savings Bank on September 19, 1996. Stephensons' Answer at ¶ 27. This mortgage was secured by the Debtors' business premises and their home. John Stephenson Deposition at 22–23; Brenda Emerson Deposition at 20. The purchase of this mortgage may be evidence of the Stephensons' attempt to gain control of the business assets of the Debtors by purchasing a security interest with priority over various attachments and liens, including the IRS and the FAA. The purchase of the mortgage at a time when the Debtors were in default on other loans to the Stephensons, were admittedly insolvent and subject to a substantial FAA fine may also be evidence of the degree of the Stephensons' personal relationship with the Debtors rather than evidence of any objective commercial rationale.

Taken together, the above recited facts in the summary judgment record are sufficient to satisfy the Trustee's burden with respect to the insider status of John Stephenson for purposes of summary judgment. Because of the father-son re-

lationship between John Stephenson and William Stephenson and the Debtors' testimony that the Stephensons worked "collectively," Alan Emerson Deposition at 51 and Brenda Emerson Deposition at 54, the Court finds that there is sufficient evidence in the summary judgment record to meet the Trustee's burden on summary judgment regarding the status of William Stephenson as an insider of the Debtors, *see Rafoth v. Bailey (In re Baker & Getty Fin. Servs., Inc.)*, 88 B.R. 792, 798 (Bankr.N.D.Ohio 1988).

Because the Trustee has supplied evidence which, when viewed in the light most favorable to the Trustee, could support a finding that the Stephensons were insiders, within the meaning of the Bankruptcy Code and RSA 545–A, at the time of the relevant transfers, the Stephensons' motion for summary judgment as to the claims under 11 U.S.C. § 547 in Count I and under 11 U.S.C. § 544 and RSA 545–A:5(II) in Count III is denied.

### B. Fraudulent Transfers and Reasonably Equivalent Value

The Stephensons argue in their motion that they are entitled to summary judgment on the Trustee's claims under 11 U.S.C. § 548 in Count II and under 11 U.S.C. § 544 and RSA 545–A:4(I) and 5(I) in Count III because (1) the Trustee has failed to offer evidence that the Debtors had an "interest" or "rights" in the Seneca that was transferred to William Stephenson; (2) the Trustee cannot establish that the Debtors had an "interest" or "rights" in the Warrior for which the Debtors received "less than reasonably equivalent value" when the airplane was transferred to John Stephenson pursuant to the foreclosure of his security interest in the plane; and (3) the Trustee cannot prove that the Debtors had an "interest" or "rights" in the UCC–1 collateral for which the Debtors received "less than a reasonably equivalent value" when they granted security interests to the Stephensons.

"Section 548 is the fraudulent transfer provision of the Bankruptcy Code. It allows the trustee to avoid a transaction made within one year before the commencement of the bankruptcy case, that depletes the debtor's assets to the detriment of the bankruptcy estate. The statute recognizes as fraudulent those transfers made with actual intent to hinder, delay or defraud creditors, as well as those that are deemed to be constructively fraudulent, because they are made for less than reasonably equivalent value, when the debtor is, or is rendered, insolvent, undercapitalized, or unable to pay its debts as they become due." *Collier on Bankruptcy* ¶ 548.01 (15th rev. ed.1998). Section 548 of the Bankruptcy Code is similar to RSA 545–A:4(I) which describes transfers that are fraudulent as to present and future creditors.

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to be engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

RSA 545–A:4(I).

RSA 545–A:5(I), describing transfers fraudulent as to present creditors, provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

### 1. Seneca Airplane

■ The summary judgment record contains sufficient evidence to support a trialworthy issue that the Debtors had an interest in the Seneca at the time the bill of sale was issued to William Stephenson on June 14, 1996. John Stephenson testified at his deposition that his son William took title to the Seneca so that Alan Emerson would not lose "his interest in the plane." John Stephenson Deposition at 52. Both Alan and Brenda Emerson stated in their answers to interrogatories that they had a mechanics' lien and "equity" in the Seneca. Alan Emerson's and Brenda Emerson's Answers to Interrogatory No. 2. The Debtors both testified at their depositions that they thought they would receive Robert Swain's bill of sale for the Seneca from Mel Dorr, who was holding it in escrow, if they made payments to the bank to satisfy Robert Swain's obligation in full. Alan Emerson Deposition at 34–35; Brenda Emerson Deposition at 41. In their answers to interrogatories, the Debtors stated that they made payments of $675 per month for forty-eight months to cover Robert Swain's loan obligation. Alan Emerson's and Brenda Emerson's Answers to Interrogatory No. 21.

### 2. Warrior Airplane

■ The Stephensons argue in their summary judgment motion that the Trustee has failed to offer evidence establishing (1) the Debtors' "interest" or "rights" in the Warrior at the time of the alleged transfer in 1996, (2) that John Stephenson

did not have a security interest in the Warrior, and (3) that the Debtors received "less than reasonably equivalent value" upon John Stephenson's foreclosure.

The summary judgment record shows that the Debtors granted a security interest in the Warrior to John Stephenson in 1993 to secure a $30,000 business loan. John Stephenson Deposition at 33. (For the purposes of deciding this motion for summary judgment, the Court has assumed that the security interest in the Warrior is valid under applicable law.) The security interest was purportedly perfected by the Debtors' delivery to John Stephenson of a bill of sale. However, no notice of the granting of the security interest and no copy of any security agreement was recorded with the FAA and counsel for John Stephenson stated at the hearing on the motion for summary judgment that the security interest was not perfected under applicable law. *See* 49 U.S.C. § 44108. Counsel for John Stephenson argued at the hearing on summary judgment that the Debtors transferred their interests in the Warrior to John Stephenson in 1995 when the Debtors indicated that they could not pay the $30,000. The Stephensons take the position that the Warrior has belonged to John Stephenson since 1995 and therefore no transfer occurred during the one year look-back period contained in 11 U.S.C. § 548.

■ The summary judgment record shows that the original 1993 bill of sale was not recorded in 1995 and the Debtors continued to maintain possession and operational control of the Warrior at all times material to the Stephenson Complaint. On September 5, 1996 the Debtors delivered a "reissued" bill of sale to John Stephenson which was recorded with the FAA on October 21, 1996, one hundred days before the filing of the Debtors' petition. *See* Exhibits to Trustee's Answers to Interrogatories. For purposes of section 548 of the Bankruptcy Code, a transfer occurs when it is so perfected that a bona fide purchaser from the debtor cannot acquire

an interest in the property transferred that is superior to the interest of the transferee. 11 U.S.C. § 548(d)(1). No transfer of title to an airplane has validity against a bona fide purchaser without notice of the transfer unless the transfer has been evidenced by a written instrument and the instrument has been recorded with the FAA. *Philko Aviation v. Shacket,* 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). Accordingly, the summary judgment record supports a finding that the transfer, for purposes of section 548, did not occur until the Debtors' reissued bill of sale dated September 5, 1996 was recorded with the FAA on October 21, 1996, within one year of the date of the petition.

The Stephensons also argue that the transfer of the Warrior, whether in 1995 or 1996, was for reasonably equivalent value because it occurred pursuant to the foreclosure of a valid security interest. As stated above, the movants admit that the security interest was not perfected. In addition, the summary judgment record does not support a conclusion that John Stephenson conducted a proper foreclosure of his security interest in the Warrior. Under Article 9 of the Uniform Commercial Code, adopted by New Hampshire at RSA 382–A:9–101 to 9–507, a secured creditor has three options in the event of a default by a debtor. The secured creditor may (1) employ strict foreclosure, i.e., retain the collateral in full satisfaction of the obligation, RSA 382–A:9–505, (2) reduce his claim to a judgment by any available judicial procedure, RSA 382–A:9–501, or (3) sell, lease, or otherwise dispose of the collateral by public or private sale, RSA 382–A:9–504. *Banker v. Upper Valley Refrigeration Co., Inc.,* 771 F.Supp. 6, 8 (D.N.H.1991); *Jenkins v. G2S Constructors, Inc.,* 140 N.H. 219, 226, 665 A.2d 354 (1995). The secured creditor can buy the collateral himself at any public sale, but he cannot buy it at a private sale unless the collateral is of a type customarily sold in a recognized market or the subject of widely distributed standard price quotations.

RSA 382–A:9–504; *Banker,* 771 F.Supp. at 10.

■ At best, the summary judgment record suggests that John Stephenson attempted a strict foreclosure pursuant to RSA 382–A:9–505. However, as detailed above, in the case of strict foreclosure under New Hampshire law, the secured party must forego any claim for a deficiency. John Stephenson testified at his deposition that he continues to seek payment of $20,937 from the Debtors on account of the $30,000 loan secured by the Warrior. John Stephenson Deposition at 48; Exhibits 4 and 9 to John Stephenson Deposition. To the extent that the Stephensons argue that John Stephenson received a bill of sale in lieu of foreclosure, the Stephensons have failed to cite to any authority that a bill of sale in lieu of foreclosure is the equivalent of a properly conducted foreclosure sale under RSA 382–A:9–504. Because the Stephensons have failed to establish in the summary judgment record that John Stephenson foreclosed on the Warrior in accordance with applicable law governing disposition of the Warrior upon the Debtors' default, they cannot claim the benefit of any presumption which might arise from any such foreclosure sale. *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (holding that price received at mortgage foreclosure sale conclusively establishes "reasonably equivalent value" of mortgage property, as long as requirements of state's foreclosure law are met). Accordingly, the Trustee is not bound by or required to rebut any such presumption. Further, the summary judgment record would support a finding that the Debtors received at best a $20,000 credit on the June 1, 1993 loan secured by the Warrior when the plane may have been worth as much as $35,000. John Stephenson Deposition at 30; Exhibits 4 and 9 to John Stephenson Deposition.

**3. September 1996 Security Interests**

■ The Stephensons argue that they are entitled to summary judgment with

regard to the Trustee's claims seeking to avoid the granting of security interests in Alan Emerson's inventory, equipment, accounts, and general intangibles to the Stephensons in September 1996. The Stephensons admit in their summary judgment motion that "there is a *substantial question* as to what if anything the Debtors in fact transferred with these security interests." Summary Judgment Motion at ¶ 37 [emphasis added]. Reading the summary judgment record in the light most flattering to the Trustee, the Court finds that at the time these security interests were granted (1) the Debtors were insolvent (*see* Alan Emerson's and Brenda Emerson's Answers to Interrogatory Nos. 6–8), (2) the Debtors' real property was subject to a judgment lien held by the FAA, (3) the Debtors' personal property was subject to several liens held by the IRS, and (4) the Stephensons were expending funds to purchase the mortgage of Laconia Savings Bank on the Debtors' business and residential real estate, apparently in an attempt to control all of the Debtors' business assets (John Stephenson Deposition at 21–22).

The Stephensons argue that the UCC–1 liens are worthless because the Debtors' personal property business assets, valued at $52,368.00 in Schedule B of the Debtors' petition, were encumbered by perfected liens of the IRS in the amount of $69,-324.99 and a perfected lien of RIC Inc. in the amount of $4,193.31. The summary judgment record, however, permits an inference that the Stephensons thought the UCC–1 liens had some value, or that they at least thought the Debtors' real and personal business assets were worth more than the liens already encumbering them, since they acquired the UCC–1 liens contemporaneously with their acquisition of a mortgage lien on the Debtors' business real estate from Laconia Savings Bank. When viewed in the light most favorable to the Trustee, the summary judgment record supports an inference that the Debtors business assets had a value to the Stephenson's that exceed the liens encumbering them and that the Debtors received no consideration for the granting of the UCC–1 liens. Accordingly, a factual issue exists as to whether the Debtors received reasonably equivalent value for the granting of these security interests to the Stephensons on account of antecedent debt and the Stephensons' motion for summary judgment on the issue of reasonably equivalent value must be denied.

The summary judgment record contains evidence which, when viewed in the light most favorable to the Trustee, could support findings that (1) the Debtors had an "interest" or "rights" in the Seneca at the time it was transferred to William Stephenson; (2) the Debtors had an "interest" or "rights" in the Warrior for which the Debtors received "less than reasonably equivalent value" when the airplane was transferred to John Stephenson; and (3) the Debtors had an "interest" or "rights" in the UCC–1 collateral for which the Debtors received "less than reasonably equivalent value" when they granted security interests to the Stephensons. For those reasons, and the reasons set forth above, the Stephensons' motion for summary judgment with respect to the Trustee's claims under 11 U.S.C. § 548 in Count II and 11 U.S.C. § 544 and RSA 545–A:4(I) and 5(I) in Count III is denied.

## III. CONCLUSION

The summary judgment record, when viewed in the light most flattering to the Trustee, is sufficient to establish the existence of the elements under 11 U.S.C. §§ 544, 547, and 548 and RSA 545–A:4 and 5 challenged by the Stephensons. For that reason, the Stephensons' motion for summary judgment is denied.

This opinion and order constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.