**In re CRAIG SYSTEMS CORPORATION, ETL Holdings, Inc., Techweld of Virginia, Ltd., and Eastern Technologies, Ltd., Debtors.**

**Stewart F. Grossman, Chapter 7 Trustee, Plaintiff,**

**v.**

**Stanley Charmoy, as Trustee of General Realty Trust, a/k/a, General Rental Trust, Defendant.**

**Bankruptcy No. 96–14589–JNF, Adversary No. 97–1553.**

United States Bankruptcy Court, D. Massachusetts. Eastern Division.

Feb. 15, 2000.

Adam J. Ruttenberg, Looney & Grossman, Boston, MA, for plaintiff.

Robert A. Stolzberg, Charmoy, Stolzberg & Holian, Boston, MA, for defendants.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court is the Chapter 7 Trustee's Complaint against Stanley Charmoy ("Charmoy"), Trustee of the General Rental Trust a/k/a the General Realty Trust (the "General Trust"). The Trustee's original Complaint contained four counts as follows: Count I—Fraudulent Conveyance under M.G.L. c. 109(a); Count II—Fraudulent Conveyance under 11 U.S.C. §§ 548, 550; Count III—Insider Preference under 11 U.S.C. § 547(b); and Count IV—Preference under 11 U.S.C. § 547(b). On December 3, 1998, this Court granted the Trustee's Motion for Partial Summary Judgment in part with respect to Counts III and IV of his Complaint. The Court entered judgment in the amount of $47,000 in favor of the Trustee and against Charmoy with respect to Count IV and denied summary judgment with respect to Count III. Subsequently, in the Joint Pretrial Memorandum filed by the parties on March 5, 1999, the Chapter 7 Trustee waived Count I.

The Court conducted a trial with respect to Counts II and III on December 2, 1999 at which three witnesses testified and nine exhibits were admitted into evidence. The issues before the Court include whether Charmoy may be considered a non-statutory insider of the Debtors for purposes of Count III and whether certain Debtors fraudulently conveyed funds to the General Trust for less than reasonably equivalent value while they were insolvent. Based upon the undisputed facts, the evidence presented at trial, and the record of proceedings in the above cases, the Court now makes its findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

### II. FACTS

#### A. *The Debtors' 1993 and 1996 Bankruptcy Cases*

On June 19, 1996, an involuntary petition was filed against Craig Systems Corporation, and, on July 19, 1996, an order for relief was entered. On July 30, 1996, the United States Trustee appointed Stewart F. Grossman as the Chapter 11 trustee, which appointment subsequently was approved by this Court. On January 3, 1997, this Court substantively consolidated the bankruptcy estates of Craig Systems Corporation ("Craig"), Eastern Technologies, Ltd. ("Eastern"), ETL Holdings, Inc. ("ETL"), and TechWeld of Virginia, Ltd. ("TechWeld") (collectively, the "Debtors"). Pursuant to an order dated January 6, 1997, the date of June 19, 1996 was deemed to be the date of the commencement of the Debtors' cases and July 9, 1996 was deemed to be the date of the order for relief for each Debtor. Approximately 14 months later, on March 30, 1998, the substantively consolidated case was converted to a case under Chapter 7, and Stewart Grossman was appointed the Chapter 7 Trustee. He filed the above adversary proceeding against Charmoy on September 11, 1997.

The bankruptcy cases involving ETL, TechWeld, Eastern, and Craig are not the first. On April 22, 1993, the Debtors filed voluntary petitions under Chapter 11 bearing case numbers 93–13747–CJK, 93–13748–CJK, 93–13749–CJK, and 93–13750–CJK, respectively. ETL was the parent company owning 100% of the stock of Craig, TechWeld, and Eastern. Harley W. Waite, Jr. ("Waite") owned 83% of the stock of ETL and served as a director, as well as president, treasurer, and clerk of each of the Debtors. He is and was at all times relevant to the Trustee's adversary proceeding married to Suzanne B. Waite ("Suzanne"), although he and Suzanne have been separated for many years and had commenced divorce proceedings in 1990 in Essex County Probate and Family Court.

B. *The Okuma Equipment, the Separation Agreement and the General Trust*

On December 20, 1985, eight years before the commencement of the previous Chapter 11 cases, Eastern and Paisley Leasing Corporation ("Paisley") executed a Master Leasing Agreement pursuant to which Paisley leased certain equipment, known as the Okuma Equipment, to Eastern for monthly rental payments of $25,673.50. On January 15, 1991, following the initiation of divorce proceedings between Waite and Suzanne, Waite purchased the Okuma Equipment from Paisley for $175,000.

On May 5,1992, Waite and Suzanne executed an Agreement, which was drafted by Charmoy. The Agreement called for Waite to establish the General Trust. The Agreement provided the following:

> ***General Rental Trust.*** Simultaneously with the execution and delivery of this agreement, the Husband has made as settlor a certain trust pursuant to an indenture of Trust of even date herewith (the "General Rental Trust") and has transferred or caused to be transferred to the Trust the following property:
>
> (a) *Machine Equipment.* The Husband has transferred to the General Equipment Rental Trust [sic] certain machinery and equipment, known as the Okuma Equipment;, [sic] owned by the Husband and used by Eastern Technologies, Ltd. ("Eastern") in its manufacturing operations pursuant to consents of Eastern and Chemical Bank. . . . Simultaneously with such transfer, Eastern has leased the Okuma Equipment to the Rental Trust [sic] pursuant to a Master Lease Agreement . . . requiring the lease by Eastern from the Rental Trust [sic] of such equipment for a term of 5 years at an annual rent of $120,000.00 and requiring at the end of the term either continuation of the rental at $120,000.00 per year and other lease terms or purchase of the Okuma Equipment for $500,000.00
>
> The Husband shall be entitled and the General Rental Trust shall, by its terms, provide that the Husband is entitled to obtain and review all books and accounts of the General Rental Trust at any time upon request made by the Husband to the trustee of the General Rental Trust until Husband has satisfied his obligation.

Despite the implication in the language of the Agreement that Waite had transferred the Okuma Equipment to the General Trust at the time the Agreement was executed, the General Trust was not created until October 27, 1992. Waite was the settlor of the General Trust, which was irrevocable. Charmoy was the trustee with broad powers to manage the assets of the General Trust. Suzanne and her children were the beneficiaries.[1] The General Trust specifically provided that neither Waite nor Suzanne could serve as trustee at any time. According to Charmoy, the General Trust "was set up in order for there to be a funding vehicle without having to have Suzanne go directly to Mr. Waite for any funds. So the monies would come into the trust and the trust would make distributions."[2]

Pursuant to the terms of the Agreement between Waite and Suzanne, Waite deeded the Okuma Equipment to the General Trust on July 15, 1992.[3] On November 7,

---

1. The Trustee pursuant to Article VIII(H) was required to "keep full and proper books of account and records" and was to submit, at least once a year, "an account of its [the Trust's] administration to each income beneficiary, to the parent or parents of a minor income beneficiary and to the legal representative (guardian or conservator) of such a beneficiary. . . . "

2. *See* Trial Transcript for December 2, 1999, p. 34.

3. Waite apparently deeded the Okuma Equipment to the "General Rental Trust" on July 15, 1992, prior to its creation.

1992, Charmoy, as Trustee of the General Trust, and Waite, in his capacity as president of Eastern, entered into an Equipment Lease pursuant to which Eastern leased the Okuma Equipment from the General Trust in accordance with a Rental Schedule set forth on Exhibit A to the Equipment Lease for a term of ten years at a base rent of $120,000 per year payable in monthly installments of $10,000. The Equipment Lease also provided for the termination of the lease upon various events of default, as well as for optional remedies and damages in the event of default.

### C. The Equipment Lease, the Promissory Note and the Debtors' 1993 Cases

Approximately six months after Eastern executed the Equipment Lease with the General Trust, the Debtors filed bankruptcy petitions. Eastern's Equipment Lease with the General Trust was not scheduled on Schedule G—Executory Contracts and Unexpired Leases or elsewhere as an unexpired lease or an executory contract and was not assumed in Eastern's bankruptcy case. The General Trust, however, was listed on Schedule F—Creditors Holding Unsecured Nonpriority Claims with a claim in the amount of $-0-. The General Trust was notified of all significant events in the Debtors' 1993 cases. Specifically, it received notice of the Order Approving Supplemental Disclosure Statement and Fixing Time for Filing Objections to Confirmation and Acceptance or Rejections of the Debtors' Third Amended Joint Plan.[4] The Debtors' Third Amended Joint Plan of Reorganization dated May 31, 1994, which plan was confirmed on June 22, 1994, expressly provided in Article IX—Assumption of Certain Executory Contracts the following:

The executory contracts and unexpired leases specifically listed on Schedule 3 shall be deemed assumed as of the Effective Date. The Final Order confirming the Plan shall constitute an Order of the Court approving such assumption, pursuant to Section 36, as of the Effective Date.

Subject to Court approval, the Debtors shall retain their right to assume executory contracts or unexpired leases subsequent to the Effective Date. *Any executory contract or unexpired leases which the Debtor has not moved to assume before the Effective Date shall be deemed rejected as of the day prior to the Commencement Date.*

(emphasis supplied). Article VIII of the Plan provided that the Debtors, upon the Effective Date, would be discharged "from all claims and all debts that arose on or before the Commencement Date and from any liability of any kind specified in Bankruptcy Code Section 1141, whether or not a proof of claim has been filed or deemed filed, such claim is allowed or the holder of such claim has accepted the Plan...." Charmoy testified that he was aware of the pendency of the Debtors' 1993 bankruptcy cases. Eastern never moved to assume the Equipment Lease with the General Trust.

### D. Agents of the General Trust

Following confirmation of the Debtors' Joint Plan and before the Amended Modification to Third Amended Joint Plan of Reorganization dated June 21, 1995,[5] the

---

**4.** *See* Certificate of Service (document # 533 in 93–13747–CJK), dated June 8, 1994, signed by Michael J. Goldberg, Esq., counsel to the Debtors, indicating that notice was sent to the General Realty Trust at 7 Kimball Lane, Lynnfield, Massachusetts 01940.

**5.** According to the undisputed facts set forth in the Joint Pre–Trial Memorandum,

The Debtors' operations after confirmation of its [sic] plan of reorganization were insufficient for any distributions to be made to administrative or unsecured creditors. Modifications to the plan ... enhancing the collateral position of the unsecured creditors were approved on October 13, 1995.

\*\*\*

The amended modifications to the plan ... provided that if a loan of up to $3,500,-

General Trust sold most of the Okuma Equipment to Northeast Machinery Exchange, Inc. for $332,500.[6] Charmoy testified that it was his decision to terminate the Equipment Lease. He did not recall precisely when he made that decision, although in an affidavit filed in this adversary proceeding, he indicated that he made the decision in late 1994 or early 1995. Charmoy, however, did not produce a copy of a letter declaring an event of default, terminating the lease or demanding outstanding lease payments or damages in accordance with the terms of the Equipment Lease.

The bill of sale, dated February 10, 1995, was executed on behalf of the General Trust "By Harley W. Waite, Jr., Trustee." Robert Samuelson, the president of Northeast Machinery Exchange, Inc., testified that he negotiated the price of the Okuma Equipment with Waite and that he did not deal with Charmoy; indeed, he stated that he never heard Charmoy's name. Charmoy testified that he determined that Eastern had defaulted under the Equipment Lease and that he designated Waite as his agent to sell the Okuma Equipment because he believed that Waite would obtain the best price for it. He also testified that it was more convenient and expedient for Waite to sign the bill of sale for the equipment as trustee of the General Trust.

Charmoy also testified that he authorized Laura Marsolais ("Marsolais"), who was Waite's administrative assistant and a bookkeeper, to act as his agent. Marsolais, however, testified that her salary was paid by Eastern and that, as part of her duties as an employee of Eastern, she kept the checkbook for the General Trust, disbursed payments, and made and received deposits for the General Trust. She stated that she had custody of the General Trust's checkbook and that she reconciled bank statements for the General Trust. She described the process by which the bills were paid by the General Trust as follows:

Q. What was the process by which General Realty Trust bills were paid?

A. Mrs. Waite would give me the bills. I would go over the list of bills to be paid with Mr. Waite. We'd talk about the availability of funds in the checkbook, and at that point he would tell me which funds [sic] I should pay—or which bills I should pay with the funds.

Q. And Mr. Waite was the one who would tell you which bills that General Realty Trust would pay.

A. Yes.

Q. And once that happened, who physically wrote the checks?

A. I did.

Q. And what did you do with them?

A. I got them signed and then mailed them.

Q. Who was the person who signed the checks?

A. There may have been two different people that signed the checks. I'm not really quite sure for certain. Stanley may—Mr. Charmoy may have signed some checks and a gentleman named Mr. Sheehan.

Q. And most of the time it was Jay Sheehan who signed the checks though, wasn't it?

A. Yes.

\*    \*    \*    \*    \*    \*

000.00 from a person or entity other than an affiliate of the Debtors were made at any time after the date of the amended modifications and used to repay the Chemical Bank Senior Claim in full, said debt would be senior to the Class 4 Creditors' Subrogation Debt.

Joint Pre–Trial Memorandum at ¶¶ 30–31, p. 5.

6. Eastern leased eight pieces of equipment from the General Trust. The bill of sale from the General Trust to Northeast Machinery Exchange, Inc. (Exhibit 5), dated February 10, 1995, referenced the sale of two pieces of equipment for $200,000.

Q. Before you left the company, did Mr. Charmoy sign any checks?

A. I don't believe so. I think it was Mr. Sheehan.

\* \* \* \* \* \*

Q. During the time that you worked for Eastern Technologies, did you have any responsibility with respect to an entity called S. Waite & Company?

A. Yes.

Q. And what were your responsibilities with respect to that entity?

\* \* \* \* \* \*

A. S. Waite & Company was an accounting practice, and when I got out of college, I worked in the accounting practice.

Q. Did you ever pay the bills of S. Waite & Company?

A. Yes.

Q. You did that the same way that— with the same procedure that you testified with respect to General Realty Trust?

A. Yes.

\* \* \* \* \* \*

Q. Okay. But during the time that you had custody of the checkbook for General Realty Trust, you also had custody of the checkbook for S. Waite & Company, is that correct?

A. Yes.

Q. And the process by which S. Waite & Company bills were paid was that Mr. Waite would give you bills and you'd prepare a list for him to review?

A. Yes.

7. *See* Trial Transcript, pp. 48–53.

8. *See* the answer to question 17 on the Statement of Financial Affairs signed by Waite under penalty of perjury in his personal bankruptcy case, Case No. 97–11921–JNF, and Waite's Response to the Examiner's Report, which was signed by Jay P. Sheehan and filed in *In re Craig Systems Corporation*, (Case. No. 96–14589–JNF).

Q. And then he'd tell you what bills to pay?

A. Yes.

Q. And whose bills were those?

A. Mr. Waite's.

Q. Were those the same kind of bills that you talked about, mortgage, utilities, credit cards?

A. Yes.

Q. Was there ever any occasions when there was not enough money in the S. Waite & Company account to pay all the bills Mr. Waite wanted to pay?

\* \* \* \* \* \*

A. Yes.

Q. What happened in [sic] those occasions?

A. We made transfer of funds.

Q. From where?

A. General Realty Trust.

Q. And the purpose of such transfer was to put sufficient funds into the account of S. Waite & Company to pay Mr. Waite's bills?

A. Yes.[7]

Jay Sheehan, the gentleman who signed most checks for Marsolais, is listed as Waite's accountant in his personal bankruptcy. Additionally, he has acted as Waite's attorney in his personal bankruptcy.[8]

In addition to the sale of the Okuma Equipment, between the Effective Date and the date of the Amended Modification, the General Trust, without notice to creditors or approval of the bankruptcy court, loaned ETL $140,000.[9] The promissory note, which is dated March 15, 1995, was

9. According to the undisputed facts set forth in the Joint Pre–Trial Memorandum, the General Trust loaned Eastern $120,000 in March of 1995 with funds from the proceeds of the sale of the Okuma Equipment. The $140,000 sum set forth in the promissory note included the $120,000 paid by the General Trust to Eastern, as well as $20,000 that the General Trust paid to Waite and Asmat Rafiq, an employee, for expenses related to a trip to the United Arab Emirates.

not secured by a security agreement and no security interest was properly perfected.

### E. *Insolvency*

Final Decrees were entered in the Debtors' previous bankruptcy cases on March 11, 1996, just three months before the involuntary petition was filed against Craig. In their Joint Pre–Trial Memorandum, the Chapter 7 Trustee and Charmoy stipulated that the Debtors were insolvent: "At all times between June 20, 1995 and March 21, 1996, the Debtors were insolvent." [10]

### F. *Payments made by the Debtors to the General Trust*

Various Debtors made payments to the General Trust, although only Eastern and ETL were liable to the General Trust for rental payments under the Equipment Lease and for payments under the promissory note, respectively. In their Joint Pre–Trial Memorandum, the parties agreed that the following payments were made:

| | |
|---|---|
| 6/14/95 | ETL made a payment to the General Trust in the amount of $5,000 in repayment of the promissory note. |
| 6/14/95 | ETL made a payment to the General Trust in the amount of $35,000 in repayment of the promissory note. |
| 1/1/95– 12/31/95 | The General Trust received a total of $96,000 in repayment of the promissory note. |
| 1/1/96– 3/21/96 | The General Trust received a total of $18,000 in repayment of the promissory note. |
| 6/20/95– 3/21/96 | ETL made payments to the General Trust totaling $66,500. |
| 6/20/95– 3/21/96 | Craig made payments to the General Trust totaling $55,000. |

The General Trust, in answers to interrogatories which were submitted into evidence as Exhibit 7, admitted that the "records as presently in the possession of the Trustee [Charmoy] do not reflect the dates of payment." In fact, according to Charmoy, the only "present records of any payments" that he had in his possession at the time he answered the Trustee's interrogatories on or around February 28, 1998 revealed the following:

The Trust received rental income in the amount of Forty Thousand ($40,000.00) Dollars from January 1, 1993 to December 30, 1993.

From January 1, 1994 to December 31, 1994 Eastern Technologies Ltd. paid rent to the Trust in the amount of Eighty – Three Thousand ($83,000.00) Dollars.

From January 1, 1995 through December 31, 1995 the Trust received rent-

---

**10.** In their Joint Pre–Trial Memorandum, the parties specifically stipulated to the following:

Throughout the pendency of the Previous Bankruptcy Cases, the debts of the Debtors were greater than the value of their property. In addition, the Debtors projected in the Previous Bankruptcy Cases that their debts would continue to exceed the value of their property until 1997.

\*\*\*

As a result of the confirmed plan of reorganization as modified, the Debtors emerged from the Previous Bankruptcy Cases with the following secured debts: (a) $896,991.92 in principal as of February 29, 1996 to Chemical Bank, (b) $1,322,123.29 in principal as of July 1, 1995 to the Class 4 Creditors Trust (a trust for the benefit of the unsecured creditors), (c) an additional $526,250.00 in principal as of July 1, 1995 to the Class 4 Creditors Trust, (d) $2,103,613.05 in principal as of June 1, 1994 to HM Holdings, Inc., (e) $606,643.98 in principal as of January 30, 1996 to Hill & Barlow, and (f) $380,824.25 in principal as of January 30, 1996 to Gordon & Wise. Each of these debts was secured by all assets of the Debtors.

\*\*\*

After the Debtors emerged from the Previous Bankruptcy Cases, the value of their property was less than the amount of their secured debts. Such assets (other than the bankruptcy estate's rights in an insurance settlement with Pacific Employers Insurance Co. with a remaining value in the approximate amount of $600,000.00) were ultimately sold for a total price of $1,925,000.00.

al of Fifty – Two Thousand Five Hundred ($52,500.00) Dollars.

The Trust also received Fifty Seven Thousand ($57,000.00) Dollars and Thirty – Nine Thousand ($39,000.00) Dollars in repayment of loan.

The payments the Trust received were in increments of One Thousand Five Hundred ($1,500.00) Dollars on a weekly basis. The One Thousand Five Hundred ($1,500.00) Dollar checks totaled the Thirty Nine Thousand ($39,000.00) Dollar amount.

ETL Holdings Ltd. paid Fifty – Seven Thousand ($57,000.00) Dollars and Craig Systems, Inc. paid Thirty—Nine Thousand ($39,000.00) Dollars all in repayment of the loan.

From January 1, 1996 through December 31, 1996 the Trust received weekly payments of One Thousand Five Hundred ($1,500.00) Dollars through May of 1996.[11]

The $140,000 promissory note did not specify a repayment schedule. Rather, ETL was entitled to prepay the demand note, in whole or in part, without penalty.

## III. POSITIONS OF THE PARTIES

### A. *The Trustee*

#### 1. Count III—Insider Preference

The Trustee asserts that payments to the General Trust within a year of the bankruptcy filing were voidable preferences as Charmoy was an insider of the Debtors. He maintains that 11 U.S.C. § 101(31) contains a non-exhaustive list of persons or entities that may be insiders of corporate debtors. He argues that insider status should be determined based upon two factors "(1) the closeness of the relationship between the transferee and the debtor, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *Schreiber v. Stephenson (In re Emerson)*, 235

B.R. 702, 707 (Bankr.D.N.H.1999) (citing *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir.1992); *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 285 (Bankr.E.D.Va.1999)). The Trustee maintains that the Agreement between two insiders of the Debtors, Harley and Suzanne Waite, demonstrates the closeness of the relationship between the General Trust and the Debtors. He also focuses on Marsolais's testimony, and the circumstances surrounding the execution of the Equipment Lease and the sale of the Okuma Equipment.

#### 2. Count II—Fraudulent Conveyance

With respect to his fraudulent conveyance count, the Trustee argues that the transfer of $47,500 was a fraudulent conveyance because the Debtors had no obligation to make rental payments or satisfy any obligation for damages after confirmation of the Debtors' Third Amended Joint Plan of Reorganization on June 22, 1994.

### B. *Charmoy*

#### 1. Count III—Insider Preference

Charmoy recognizes that the Trustee, in order to recover $121,500 on Count III as a preference, must establish that he was an insider of the Debtors. He maintains that there is not one scintilla of evidence to support this position. Because, in his view, he was not an insider of the corporate Debtors as that term is defined in 11 U.S.C. § 101(31)(B), he maintains that the Trustee must prove either (1) a close relationship between the parties, or (2) that the transactions between the parties were not conducted at arms length. *Sticka v. Anderson (In re Anderson)*, 165 B.R. 482, 486 (Bankr.D.Oregon 1994); *Miller v. Schuman (In re Schuman)*, 81 B.R. 583, 586 (9th Cir. BAP 1987).

Charmoy argues that the Trustee offered no evidence showing that he exerted

---

**11.** *See* Answers No. 12 and No. 13 to Defendant's Answers to Plaintiff's First Set of Interrogatories (Exhibit 7).

control over the Debtors or that the Debtors exerted control over the General Trust, that the Trustee failed to establish a close relationship between the parties and that although "the Trust may have accommodated the business of which Harley Waite was a principal, the evidence ... [was] ... that the Trust did so to protect its legitimate interest as a creditor." In short, Charmoy maintains that the Debtors and the Trust always acted at arm's length, stating that "the fact that Charmoy used Waite (or Marsolais) for various ministerial functions (such as paying checks or negotiating the sale of some of the equipment) does not change defendant's status as a non-insider of the debtor. Rather, it reflects Charmoy's independent judgment that the trust would benefit by using Waite's expertise or resources."

### 2. Count II—Fraudulent Conveyance

With respect to Count II, Charmoy argues that the Trustee must establish (1) the amount of money fraudulently conveyed; and (2) that the Debtors received less than reasonably equivalent value in exchange for the transfer. In the first place, Charmoy maintains that the Trustee failed to establish how much was paid on the promissory note for principal and interest. He states that, although there was evidence that $74,000 of the $121,500 paid between June 21, 1995 and March 21, 1996 was repayment of the promissory note, there was no evidence that the additional $47,500 paid during that time period was not repayment of the note so that the Court will be unable to find that there was a fraudulent transfer of any amount.

Alternatively, Charmoy maintains that it was proper for the Debtors to pay $47,500 toward the Equipment Lease because "the debtor owed the defendant well over a quarter of a million dollars on the lease in addition to the monies owed on the Promissory Note." He adds the following:

> Some of this amount was current rent for the unsold equipment and some was antecedent debt because the debtor's de-

fault on the lease. The Bankruptcy Code is explicit that payment of an antecedent debt such as existed here satisfied the "reasonably equivalent value" requirement of § (B)(i) [sic]. Payment of either current or antecedent debt is acceptable as receiving "value" under the Code; however, even if it were not, the plaintiff failed to introduce evidence from which the court could determine the amount then currently due or that which was past due.

## IV. DISCUSSION

### A. Count III—Insider Preference

■ To recover a preferential transfer, the Chapter 7 Trustee must establish that there was a transfer of an interest of the Debtors in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The only element of the Chapter 7 Trustee's preference claim that is disputed is whether Charmoy was an insider of the Debtors. The other elements of a preference, including the exis-

tence of antecedent debt and insolvency are not disputed.[12]

Bankruptcy Code § 101(31) contains a non-exhaustive list of entities and individuals who are "insiders" for purposes of the Bankruptcy Code. For corporations, these include the following:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B). A relative of a director, officer, or person in control of the debtor includes that person's spouse. 11 U.S.C. § 101(45). Because the list of "insiders" is non-exhaustive, courts have held that " 'an insider may be any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny.' " *Koch v. Rogers (In re Broumas)*, 135 F.3d 769, 1998 WL 77842 *7 (4th Cir.1998); *Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir.1996) (quoting *Hunter v. Babcock*, 70 B.R. 662, 666 (Bankr.N.D.Ohio 1986)). Thus, insider status is determined by a factual inquiry into the debtor's relationship with the alleged insider, including whether the debtor and the alleged insider dealt at arms length with the debtor. *Strickland*, 230 B.R. at 285 (citing S.Rep. No. 95–989, at 25 (1978)), U.S.Code Cong. & Admin. News pp. 5787, 5810. *See also Gray v. Chace (In re Boston Publishing Co., Inc.*, 209 B.R. 157, 169–70 (Bankr. D.Mass.1997) ("For a person to be considered an insider it must appear that they have 'at least a controlling interest in the debtor or … exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets).' ".

In *Emerson*, the bankruptcy court enumerated factual elements that courts use in evaluating insider status. These include the following:

1. Whether the loan made to the debtor was documented (e.g., promissory note, mortgage and specified repayment terms);

2. Whether the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans;

3. Whether the transferee knew that the debtor was insolvent at the time the debtor made the loans or recorded the security agreements;

4. Whether there were numerous loans between the parties;

5. Whether there were any strings attached as to how the debtor could use loan proceeds;

6. Whether the loans were commercially motivated;

7. Whether the transferee had an ability to control or influence the debtor;

8. Whether there was a personal, business, or professional relationship between the transferee and the debtor allowing the transferee to gain an advantage such as that attributable simply to affinity;

9. Whether the transferee had authority to make business decisions for the debtor;

10. Whether there is evidence of a desire to treat the transferee differently

---

**12.** The Court notes that the Chapter 7 Trustee's fraudulent conveyance count is predicated upon the discharge of obligations under the Equipment Lease. Charmoy disputes that assertion, stating "[w]here debtors continued to accept and receive valuable benefits under a contract that was deemed rejected, and made payments on account of such benefits, the debtors validly paid for such services provided in accordance with a residual obligation which may be characterized as quantum meruit or quasi contract." *See* Defendant's Post–Trial Memorandum, p. 11, n. 8. The Court construes this as an admission of antecedent debt with respect to payments under the Equipment Lease.

from all other general unsecured creditors;

11. Whether there was an agreement among the parties to share profits and losses from business transactions.

*Emerson,* 235 B.R. at 707 (citations omitted).

Based upon an evaluation of the closeness of the relationship between the Debtors and Charmoy and the nature of the transactions between the Debtors and Charmoy, as well as the factors identified by the court in *Emerson,* the Court finds that Charmoy was an insider of the Debtors. He drafted the Agreement pursuant to which Waite, a statutory insider, agreed to transfer the Okuma Equipment to the General Trust, for the purpose of funneling corporate funds to Suzanne, who also qualifies as a statutory insider. Although Charmoy argues that Waite and Suzanne are separated and, therefore, Suzanne should not be considered an insider, the Court disagrees. The statute is plain and does not need a judicial gloss. *See* 11 U.S.C. § 101(45).

More importantly, Charmoy utilized Waite as his agent. Indeed, the Court finds that Charmoy ceded control over the General Trust to Waite who was not only an officer and director of the Debtors but a person in control over the Debtors. Waite's status as the 83% owner of ETL, the parent of the other corporate Debtors, as well as his conduct in executing the Agreement pursuant to which he agreed to funnel monies to Suzanne through Eastern and his conduct in negotiating the Equipment Lease with the General Trust on behalf of Eastern, supports this conclusion. Notably, Waite, through his position as an officer and director of the Debtors, continued to funnel monies through the General Trust to Suzanne even after the Debtors filed their 1993 bankruptcy cases and obtained confirmation of their Chapter 11 plans. Thus, Charmoy, indirectly through his agent, Waite, had the ability to control and influence the Debtors, and the Debtors were able to and did treat the General Trust differently from all other creditors. This is evident from the fact that Craig made payments to the General Trust even though it was not a party to the Equipment Lease or liable on the promissory note that was executed by ETL.

Because Charmoy used an insider as his agent to conduct the business of the General Trust, the Court finds that, as principal, he is bound by the insider status of his agent, Waite. Charmoy permitted Waite to negotiate the sale of the Okuma Equipment and to sign the bill of sale as trustee of the General Trust. Although Charmoy testified that he made the decision to sell the Okuma Equipment after Eastern's default under the Equipment Lease, he did not produce a notice of default or demand letter and he did not testify that he reserved the right to determine the adequacy of price. In light of the testimony of Ms. Marsolais and the absence of adequate records, the Court finds that Charmoy's testimony and version of events was not plausible.

Charmoy further permitted Waite to use the services of an employee of Eastern, Ms. Marsolais, to keep the checkbook and bank statements of the General Trust and to receive and disburse funds that the General Trust received from the Debtors. Indeed, Waite's accountant and attorney, Sheehan, signed the checks for the General Trust, and Waite was able to disburse corporate funds through the General Trust to his accounting and management firm, S. Waite & Company, for his personal use, although he was not a beneficiary of the General Trust. This did not constitute the delegation of ministerial acts to agents as Charmoy contends; rather, it constituted a relinquishment of control and supervision of the General Trust's assets, namely the Debtors' monies used to make rental payments or payments on the $140,000 promissory note, to a director, officer and person in control of the Debtors. Thus, the person in control of the Debtors was the person in control of the General Trust. Charmoy's agent, Waite, was thus in a

position to use the Debtors' assets for his personal benefit and that of his spouse through the vehicle of the General Trust.

Other evidence compels the conclusion that Charmoy was an insider of the Debtor. Not only did he appear to cede control over the monetary affairs of the General Trust to an insider of the Debtors, at least with respect to monies from the Debtors, he lent money to Eastern in the sum of $120,000 and only later obtained a promissory note in the sum of $140,000 from ETL, dated March 15, 1995. Although the note recited that it was secured, it was not. Although Charmoy sought to justify this post-confirmation loan on the basis that he had an interest in keeping the Debtors afloat, the Court finds that the loan to an insolvent debtor was not indicative of an arm's length relationship.[13] Moreover, the Court is unpersuaded by Charmoy's rationale in view of the admission in the Joint Pre–Trial Memorandum that "[t]he Debtors' operations after confirmation of its [sic] plan of reorganization were insufficient for any distributions to be made to administrative or unsecured creditors," a circumstance that necessitated the filing of modifications to the plan, which were only approved by the bankruptcy court on October 13, 1995, after the General Trust made the $140,000 loan. Thus, the loan payments made by the Debtors to the General Trust after March 13, 1995 demonstrate that the General Trust was treated differently than other creditors.

The close relationship between the Debtors and Charmoy and absence of an arm's length relationship between them is supported by Charmoy's decision to use Waite as his agent and to permit him to determine which of Suzanne's bills to pay and when, even though he testified that the relationship between Waite and the

prime beneficiary of the General Trust, Suzanne, was at times hostile. It is also supported by inconsistencies between events and recitations in documents prepared by Charmoy and the absence of adequate records.[14] Charmoy was unable to produce a demand letter with respect to the Okuma Equipment after Eastern defaulted on its lease obligation. Moreover, in Defendant's Answers to Plaintiff's First Set of Interrogatories, Charmoy admitted that he had limited records pertaining to payments made by the Debtor's to the Trust. The Court infers from this lack of record keeping with respect to payments received from the Debtors, as well as Charmoy's inability to testify to or state in his pleadings which pieces of the Okuma Equipment were retained by Eastern, that he ceded control over the General Trust to Waite. Indeed, it would appear more accurate to say that Waite was the principal and Charmoy was the agent given the way the General Trust operated. Thus, the Court finds that the structure of the General Trust on paper is not controlling, and substance must prevail over form.

Because the other elements of a preference are not disputed, including the transfer of monies to satisfy antecedent debt and the Debtors' insolvency, the Court shall enter judgment in favor of the Trustee and against Charmoy on Count III of the Trustee's Complaint.

## B. *Count II*

Section 548 of the Bankruptcy Code provides in relevant part the following:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the

---

**13.** The Court observes, but does not decide, that Charmoy's decision to loan ETL $140,000 would not appear to be consistent with his role as a fiduciary.

**14.** For example, the Agreement between Waite and Suzanne, which Charmoy drafted,

indicated that Waite "had transferred" the Okuma Equipment to the General Trust, although the General Trust indenture had not been signed at the time. Similarly, the promissory note indicated that it was secured when in fact it was not.

filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(A)–(B). The Trustee's fraudulent conveyance count against Charmoy is essentially an alternative to the relief requested in Count III. To the extent that he seeks relief under § 548(a)(1)(B), it is predicated upon the discharge of any obligation that Eastern may have owed to the General Trust in the Debtors' previous Chapter 11 cases. Thus, in the Trustee's view, under Count II, any payments that the Debtors made with respect to the Equipment Lease would be either intentionally fraudulent or constructively fraudulent because any debt that Eastern may have had with respect to the Equipment Lease was discharged as a result of the order of confirmation entered on June 22, 1994.

■ The Court finds that the General Trust was not listed on Schedule G—Executory Contracts and Unexpired Leases, but that the General Trust had notice of the 1993 bankruptcy filings. Not only was it listed on Schedule F as an unsecured creditor in Eastern's bankruptcy case, Debtors' counsel sent the General Trust notice of the Order Approving Supplemental Disclosure Statement and Fixing Time for Filing Objections to Confirmation and Acceptance or Rejections of the Debtors' Third Amended Joint Plan in the jointly administered 1993 cases, in which the Debtors notified creditors that failure to assume any unexpired leases would constitute a deemed rejection of the unassumed leases and that failure to file a proof of claim resulting from rejected leases would result in the discharge of prepetition claims. See 11 U.S.C. § 502(g). In view of this notification and Charmoy's admission that he was aware of the Debtors' 1993 bankruptcy cases, Eastern was discharged of any obligation with respect to the Okuma Equipment and any continued payments for damages arising from Eastern's default under the Equipment Lease by Eastern or any of the other Debtors (as opposed to payments for continued use of the Okuma Equipment) would be without consideration. In other words, the Debtors would not receive reasonably equivalent value in exchange for those payments.

■ Charmoy argues that payments may have been made for the use of the Okuma Equipment that was not sold and that the Chapter 7 Trustee failed to allocate the amount of payments made toward satisfaction of the promissory note (admittedly antecedent debt) and lease payments. The Court agrees that the Trustee has failed in this regard. The Court finds, however, that Charmoy cannot defeat the Chapter 7 Trustee's fraudulent conveyance count so easily by calling into question the sufficiency of the evidence when he had the sole possession of facts that could dispel the negative inferences drawn from the admitted payments. See In re Crabtree, 39 B.R. 718, 724 (Bankr.E.D.Tenn.1984) ("When a party has exclusive knowledge of facts and fails to testify to them ... a negative inference can be drawn against

the party."). From the agreed payments, many of which were in the weekly amount of $1,500, a sum that does not comport with the $10,000 per month payment due under the Equipment Lease, the Court finds that during the year preceding June 19, 1996, the Debtors made payment to the General Trust totaling $121,500. Of that amount, $74,000 can be attributed to payments on the note and the remainder, $47,500, can be attributed to lease payments.[15] Charmoy submitted no evidence to contradict this inference, although it was his obligation as trustee of the General Trust "to keep full and proper books of account and records." Moreover, it was his obligation to keep track of and account for the Okuma Equipment that Waite transferred to the General Trust and that the General Trust leased to Eastern.

The Court finds that the burden shifted to Charmoy to rebut the Trustee's evidence that the Debtors made payments totaling $47,500.00 for the Okuma Equipment. In other words, the burden shifted to Charmoy to account for the payments that the General Trust received, as well as to account for the Okuma Equipment it retained and permitted Eastern to keep. Charmoy submitted no evidence in this regard.

Moreover, several badges of fraud taint the circumstances surrounding continued

payments under the Equipment Lease. In *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248 (1st Cir. 1991), the United States Court of Appeals for the First Circuit stated the following:

> It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors. Therefore, as is the case under the common law of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer.

> \*　　\*　　\*　　\*　　\*　　\*

> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and after the transfer, (5) retention by the debtor of the property involved in the putative transfer.

926 F.2d at 1254.[16]

In the present case, the Court notes that several badges of fraud are present. As

---

**15.** Because the parties admit that Craig and ETL paid the General Trust a total of $40,000 on or prior to June 14, 1995 on the note, and because they admit that they paid the General Trust a total of $96,000 in all of 1995, $56,000 must have been paid between July and December of 1995 ($96,000 minus $40,000). The parties also admit the payment of $18,000 on the note in 1996. Thus, $74,000 of the total payments can be attributable to the note and $47,500 can be attributed to lease payments.

**16.** Under the Uniform Fraudulent Transfer Act, courts evaluate the following badges of fraud:

(a) the transfer or obligation was to an insider;
(b) the debtor retained possession or control of the property transferred after the transfer;

(c) the transfer or obligation was disclosed or concealed;
(d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(e) the transfer was of substantially all the debtor's assets;
(f) the debtor absconded;
(g) the debtor removed or concealed assets;
(h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

the Court has discussed, there was a special relationship between Waite and Charmoy. Charmoy used Waite as his agent to sell the Okuma Equipment and corporate monies for rental payments were funneled through the General Trust to Suzanne. Additionally, the Equipment Lease was not disclosed on Schedule G and was never assumed. Although the lease was deemed rejected on June 22, 1994, Charmoy did not produce a notice of default or a demand letter with respect to the return of the Okuma Equipment and did not keep track of what equipment was sold and what equipment was retained. Charmoy admitted that he had notice of the 1993 bankruptcy cases but did not file a proof of claim with respect to the rejected leases and continued to accept monies toward rental payments while the Debtors were insolvent and other creditors were not being paid.

The Court concludes that the Trustee would be entitled to prevail on Count II of his Complaint if the Court were required to decide that Count. In view of the Court's determination that Charmoy was an insider and in view of his admission that payments made by the Debtors related to antecedent debt, the Court need not decide Count II as it is essentially moot.

## V. CONCLUSION

In view of the foregoing, the Court shall enter judgment in favor of the Chapter 7 Trustee and against Charmoy on Counts III of the Complaint in the total sum of $121,500.00. Count II is moot.

*Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338 (10th Cir.1998), *cert. denied,* 525 U.S. 873, 119 S.Ct. 172, 142 L.Ed.2d 140 (1998).